AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California



**FILED**

Feb 20 2025

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/VeronicaCota        DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

611 West Commercial Avenue
El Centro, California 92243

)
)
)
)
)
)

Case No.    25MJ8117

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324(a)(1)(A)(ii) | Transportation of Certain Aliens |
| 8 USC 1324(a)(1)(A)(ii) & (v)(I) | Conspiracy to Transport Certain Aliens |

The application is based on these facts:

See attached Affidavit of Border Patrol Agent Lucas Heipt, incorporated herein by reference.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lucas Heipt, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ telephone _____ *(specify reliable electronic means)*.

Date:    02/19/25

*Judge's signature*

City and state:  El Centro, California

HON. LUPE RODRIGUEZ JR., U.S. MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

### *611 West Commercial Avenue, El Centro, California 92243*

The SUBJECT PREMISES to be searched is 611 West Commercial Avenue, El Centro, California, 92243, and includes the residence, all rooms, attics, basements, garages, storage areas, safes, briefcases, containers, trash areas, trash containers, surrounding grounds, vehicles associated with this address and outer buildings of any kind located thereon. The SUBJECT PREMISES is located within the city boundaries of El Centro, California, and is described as follows:

The residence is a detached one-story white with a brown roof residence with stucco on the exterior. The perimeter of the residence is enclosed with a four-foot-tall chain link fence and a chain link fence that opens for access to the car port. The residence is accessible from Commercial Avenue as well as from the alley between Commercial Avenue and Broadway Avenue. The west end of the alley is accessible from 7th Street and the east end of the alley is accessible from 6th Street. The metal security front door is hinged on the left with the door handle on the right side.

On the following page are photographs of the front and the overhead view of the SUBJECT PREMISES.



Front view of 611 West Commercial Avenue.



Rear view from the alley of 611 West Commercial Avenue.

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

The items to be seized are evidence of transportation of certain aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii), and conspiracy to commit the same, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (v)(I):

a.   Lists containing names of associates and arrangers involved in alien smuggling, bringing illegal aliens into the United States, harboring illegal aliens, and transporting illegal aliens within the United States.

b.   Lists, ledgers, logs, records, and other documents concerning the number of aliens smuggled into the United States from a place outside thereof, the number of aliens harbored, the number of aliens transported within the United States, and the amount of money paid and received for such smuggling activities.

c.   Financial records, bank records, check books, money orders, money order receipts, U.S. currency, and foreign currency that may be proceeds of alien smuggling activities.

d.   Documents showing possession, dominion, and/or control of the Subject Premises, including but not limited to utility bills and statements, telephone records, correspondence, mail, rental or lease agreements, real estate deeds, and other documents related to the Subject Premises.

e.   Property of smuggled aliens in the form of wallets, purses, suitcases, tote bags, clothing, identification documents, and entry documents, which constitute evidence of harboring and smuggling illegal aliens.

f.   Travel documents and correspondence, both domestic and foreign, relating to alien smuggling arrangements and itineraries.

g.   Vehicle registration documents of vehicles used in the smuggling and transportation of illegal aliens.

h.    Passports and any United States Government documentation relating to the alienage of persons.

i.    Foreign passports and foreign identification documents relating to the alienage of persons.

j.    Airline/airfare tickets relating to the travel of illegal aliens, to include other modes of transportation.

k.    Cellular telephones and cellular telephone records that may be used by alien smugglers to facilitate alien smuggling operations, including but not limited to stored information, text messages and voice messages relating to arrangements of travel and payment, names and telephone numbers of co-conspirators and illegal aliens.

l.    Two-way radios and two-way radio records that may be used by alien smugglers to communicate in areas with sparse cellular telephone coverage, AND

m.    Weapons, firearms and ammunition.

As used throughout this list of items to be seized, the terms "items," "documents" and "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

2.    Authorization is sought to search for and seize evidence of the crimes described above in paragraph 1. This authorization includes the search of physical documents and includes the search of cell phones.

The seizure and search of any cell phones will be conducted in accordance with the "Procedures for Electronically Stored Information" provided in the affidavit submitted in support of this warrant. The evidence to be seized from the cell phones will be electronic records, communications, and data such as emails, text messages,

photographs, audio files, videos, and location data, including but not limited to the following:

a.  All documents, including all temporary and permanent electronic files and records, relating to any and all of the items described in paragraph 1 above.

b.  User-attribution data to include data reflecting who used or controlled the cell phone at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed.  User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the device, electronic address books, calendars, instant messaging logs, electronically stored photographs and video, file structure and user-created documents, including metadata.

3.  Authorization to search the cellular telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below.  The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 18, 2025, up to and including the date of the execution of this warrant:

a.  tending to indicate efforts to transport smuggled aliens from Mexico into the United States and within the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in the transportation of smuggled aliens;

      d.      tending to identify travel to or presence at locations involved in the transportation of certain aliens such as stash houses, load houses, or delivery points;

      e.      tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

      f.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I).

1

**AFFIDAVIT**

2      I, Lucas J. Heipt, being duly sworn, state as follows:

3                                    **INTRODUCTION**

4          1.      I make this affidavit in support of an application for a warrant to search the

5      following location:

6                    611 West Commercial Avenue, El Centro, California, 92243

7                    (the "**Target Location**"), as further described in Attachment A;

8      and to search for and seize items that constitute evidence of crimes, contraband, fruits of

9      crimes, or other items illegally possessed, and property designed or used, intended for use,

10     or used in committing a crime, specifically, violations of federal crime law, namely, Title

11     8, United States Code, Section 1324(a)(1)(A)(ii) (transportation of certain aliens); and Title

12     8, United States Code, Section 1324(a)(1)(A)(ii) and (v)(I) (conspiracy to transport certain

13     aliens) (the "Target Offenses"), as further described in Attachment B.

14         2.      The facts set forth in this affidavit are based on my own personal knowledge

15     as a Border Patrol Agent, knowledge obtained from other individuals during my

16     participation in this investigation, including other law enforcement officers, my review of

17     documents and records related to this investigation, communications with others who have

18     personal knowledge of the events and circumstances described herein, and information

19     gained through my training and experience. Because this affidavit is submitted for the

20     limited purpose of obtaining a search warrant for the **Target Location**, it does not include

21     every fact known to me or other investigators concerning the investigation.  All dates and

22     times are approximate.

23                          **TRAINING AND EXPERIENCE**

24         3.      I am a United States Border Patrol Agent (BPA) within the United States

25     Department of Homeland Security (DHS), Customs and Border Protection (CBP), United

26     States Border Patrol (USBP). I have been employed as a BPA since January of 2009. I am

27     presently assigned as a Border Patrol Agent-Intelligence with the El Centro Sector Anti-

28     Smuggling Unit (ASU). I am a graduate of the United States Border Patrol Academy at the

Federal Law Enforcement Training Center in Artesia, New Mexico. I have received training in investigating alien smuggling activity, identifying immigration violations, and enforcing numerous immigration and customs laws within the United States.

4.     I am currently assigned to conduct investigations of criminal violations relating to alien smuggling and other illicit cross-border activity. I have participated in numerous alien smuggling-related investigations, many of which involved the arrest of persons for alien smuggling offenses and the execution of residential search warrants.  In those cases, I conducted interviews with the arrested persons and with their associates. Through these interviews, I have gained a working knowledge and insight into the activities and operations of alien smugglers and their complex network of co-conspirators.

5.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for alien smugglers to maintain financial records, or ledgers; communication notes; lists of aliens smuggled, along with smuggling fees paid or due; alien smuggling proceeds; telephones and telephone numbers; money order and money order receipts; firearms and miscellaneous weapons, along with other evidence, which are kept in the immediate control and possession, such as the residence, of the alien smugglers. Furthermore, smugglers communicate through the use of social media, such as Facebook, and electronic applications, such as WhatsApp, Snapchat, and Instagram, using their cellular telephones, tablets, or computers, because they offer encryption capability and the ability to access accounts using different devices in the immediate control and possession of alien smugglers.

6.     Through my training and experience, I have gained a working knowledge of and insights into the workings of criminal organizations. I have also gained extensive information as to the operation habits of persons who make their living as alien smugglers. I have become familiar with the behavior, speech, routes, and methods of operation utilized by criminal organizations to avoid detection and apprehension by law enforcement officers.

7.    This investigation to date has identified violations pertaining to human smuggling, the following pertains to information on human smuggling based on my training and experience. I have learned that non-citizens without status choose to enter other countries illegally for many reasons. In some cases, these non-citizens will enter into an agreement with a smuggler to enter the United States illegally. The smuggler will in turn determine a set fee depending on the method or route used by the smuggling organization or the individual. Smuggling organizations vary by nationality of aliens smuggled, size of organization, levels of hierarchy, and sophistication of their method of operation. Smuggling organizations operate by establishing a network that facilitates the undetected movement of these non-citizens from source countries through transit countries with the ultimate goal of successfully entering the United States in violation of United States law. Smuggling organizations are ever-changing in their level of sophistication and have become increasingly violent by engaging in kidnapping, extortion, assault, rape and murder.

8.    Smuggling organizations can vary in the number of co-conspirators, operating structure, financial structure, areas of operation, and nationality of the aliens the organization smuggles. Smuggling operations can be as small as an individual operating independently or as large as an organization. The individual or organization provides a guide, transportation, temporary housing for aliens at points along the journey and/or once they arrive in the United States. Larger smuggling organizations typically have a head of the organization for the oversight, recruiters who are responsible for identifying aliens seeking to be smuggled into the United States, guides (aka coyotes) responsible for leading these non-citizens across the border, transporters (aka drivers) who transport aliens to stash houses, facilitators who are often United States citizens or lawful permanent residents who provide assistance for these non-citizens to include providing phones, false documents for employment, arranging housing and transportation and can also perform the role of collecting smuggling fees using various money services businesses or bulk cash. Relatedly, I am aware that smugglers and people being smuggled often may use or be provided with

false or fraudulent identification or employment documents in an effort to conceal the lack of legal status and conceal the organization's smuggling activities. I know that smugglers, smuggled people, and the properties used for smuggling may have such identification and employment documents, all of which can be evidence of illegal alien smuggling.

9.      Those engaged in human smuggling, in addition to utilizing their personally owned vehicles and vessels, utilize transportation assets which may be borrowed or rented from co-conspirators. Smugglers are known, to utilize stolen vehicles and vessels to conduct smuggling operations. Smugglers are known to place assets in the names of relatives, intimate partners and close friends in order to avoid detection of those assets by law enforcement agencies. Even though these assets are placed in others' names, the subjects(s) are known to retain records, documents, and registration reflecting the purchase of those assets while continuing to use those assets and exercise domain and control over them. Similarly, I am aware that individuals engaged in human smuggling and their organizations often work with multiple properties, and those properties may be rented or owned in the names of others, also in an effort to distance the smugglers from illegal activity and avoid detection by law enforcement. I am aware that smugglers and the properties they use often have documents and other records reflecting the use, ownership, and rental of such properties, as well as other properties an organization may have previously used or intends to use in the future.

10.      Human smuggling operations and individuals often keep records of their illegal activities for a period of time extending beyond the time during which they actually transport or harbor these non-citizens, in order to maintain business records and contact with their criminal associates for the conduct of future human smuggling. Additionally, records are maintained of prior smuggling transactions for which, for example, a human smuggler might still be owed money, or might owe someone else money. Human smugglers often travel and will conduct financial transactions in multiple locations, including transactions between the United States and Mexico or other foreign countries. They may store these records of proceeds including the financial records, bank records,

check books, money orders, money order receipts, U.S. current and foreign currency on their person or in a location such as their residence.

11. Human smugglers and human smuggler operations can amass large quantities of cash from smuggling and often attempt to legitimize these profits through the use of banks, financial institutions, other businesses and their attendant services that include but are not limited to accounts, securities, travelers' checks, gift cards, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, safety deposit boxes, real estate, vehicles, and other assets. Use of financial institutions, other business and their attendant services need not be in-person transactions as many utilize internet-based applications and services to conduct financial transactions. Further, I am aware that smugglers can possess and the properties they use for smuggling purposes can contain records and other items reflecting smuggling proceeds or the disposition, expenditure, or concealment of smuggling proceeds, including financial records and items as listed above, vehicles, or other commodities of value. Further, I know that illegal smuggling generates proceeds for those involved beyond any legitimate income and employment they may have, and this illegal income often is not reported to local, state, or federal authorities or reflected in any employment records. Accordingly, employment and other income- or tax-related records—which also can be in the possession of smugglers or contained at properties used for smuggling—also can be evidence of illegal smuggling activities, the proceeds of such smuggling, and the financial gain to the smugglers and their organization.

12. Human smugglers often maintain more than one cellular or digital device (including computers, iPads, and other devices) to use in furtherance of their illegal activities. Those involved with smuggling activity and organizations often use separate cellular phones: for instance, one for personal use and another for the purpose of conducting criminal activities. Cellular devices used for criminal activities are often unregistered or can be registered to other person(s). Additionally, smugglers are known to have cellular devices for communications with persons in foreign countries and separate cellular devices for communications within the United States. Cellular phone-related

evidence includes voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting non-citizens without status are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up these non-citizens for transportation into the United States and where to take these non-citizens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Non-citizens without status also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

13. Based upon my training, experience, and consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

14.     This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a.     tending to indicate efforts to transport smuggled aliens from Mexico into the United States and within the United States;

    b.     tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the transportation of smuggled aliens within the United States;

    c.     tending to identify co-conspirators, criminal associates, or others involved in the  transportation of smuggled aliens within the United States;

    d.     tending to identify travel to or presence at locations involved such as stash houses, load houses, or delivery points for the transportation of smuggled aliens within the United States;

    e.     tending to identify the user of, or persons with control over or access to, the cellular phones; and/or

    f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

15.     Further, I am aware that individuals involved in human smuggling and smuggling organizations often possess firearms and/or ammunition and can be engaged in other illegal activities, such as the illegal possession, transfer, or trafficking of firearms and ammunition. I am aware that human smuggling organizations and their members, like drug traffickers, often maintain firearms and ammunition as a means of protecting their illegal contraband (smuggled people and the proceeds of smuggling activity), and such firearms and ammunition may be illegally possessed or acquired. Further, based on my training and experience, and consultation with other law enforcement officers and entities, I know that investigations pertaining to the illegal use, possession and or sale of firearms and/or the illegal use of firearms during the commission of a serious offense are of particular risk to

7

the public. From my training and experience and liaison with other law enforcement agencies and personnel, I know it is common for individuals who illegally acquire, possess, sell, or use firearms in the commissions of serious offenses to keep firearms concealed on their person and/or other locations under their control. Individuals who unlawfully acquire, possess, sell and/or, transfer firearms attempt to hide the ability of law enforcement to trace the firearms by either purchasing illegal firearms which bear no serial number, or by having had the weapons serial number altered, obliterated, removed, or changed.

## FACTS SUPPORTING PROBABLE CAUSE

16.    The **Target Location** has been identified as the residence of Edward Antonio RAMOS-Garcia (hereinafter "RAMOS"). RAMOS is a known alien smuggler that has been apprehended by Anti-Smuggling Unit (ASU) Agents on two previous occasions.

17.    On February 17, 2025, at approximately 11:30 AM, ASU Border Patrol Agents (BPAs) were conducting surveillance on a white Nissan Maxima (Nissan), previously identified as a known alien smuggling conveyance in Calexico. While conducting surveillance, RVSS observed one individual run from the International Boundary Fence (IBF) to the All-American Canal, enter the water, then swim across and exit the canal. The subject then ran north into a solar panel field on the north side of Anza Road. Thereafter, the Nissan began travelling west on Highway 98. The Nissan drove to Anza Road, parallel to the All-American Canal. The Nissan did a U-turn on Anza Road and then travelled back north to Highway 98. ASU BPAs observed the Nissan make several unusual maneuvers before the Nissan travelled into the city of El Centro where it eventually arrived near the city's outdoor skateboarding facility and parked at the intersection of 6th and Park Avenue.

18.    At this point, a Border Patrol small unmanned aircraft system (SUAS) arrived and assisted with aerial surveillance. After being parked for several minutes, a male subject approached the Nissan on foot. At approximately 4:15 PM, a male subject, later identified as Pedro LOPEZ-Orozco (LOPEZ), emerged from the back seat of the Nissan once

approached by the man on foot. It should be noted that during surveillance and prior to this moment, no subject was ever observed in the vehicle besides the driver.

19. ASU BPAs and the SUAS observed that LOPEZ was wearing all tan clothing that was visibly wet and muddy. Once LOPEZ exited the car, he was met by the man on foot. The two subjects outside the vehicle briefly conversed with the driver of the Nissan and then the Nissan left the area.

20. ASU BPAs terminated surveillance on the Nissan and focused their attention on LOPEZ and the unknown male individual. The male individual walked LOPEZ towards 6th Street into an alleyway between Broadway and Commercial Avenue. BPAs passed by the pair as they were walking and immediately recognized the male individual as Edward Anthony RAMOS-Garcia (RAMOS). RAMOS is a well-known and documented alien smuggler and has been arrested numerous times before for alien smuggling.

21. RAMOS led LOPEZ to a trash enclosure behind Lily Romero's Tax Services located on Broadway Street in El Centro, California. RAMOS instructed LOPEZ to hide then walked away. ASU BPAs established a perimeter and maintained visual on both RAMOS and LOPEZ with the assistance of the SUAS. Over the next several hours, LOPEZ stayed concealed behind the business while RAMOS would walk in circles around the block while making repeated phone calls. RAMOS delivered water to LOPEZ and continually checked on him from the alleyway.

22. After checking on LOPEZ several times and delivering him water, RAMOS walked north on 6th Street towards his residence at Commercial Avenue. ASU BPAs know this to be RAMOS' residence from previous arrests. ASU BPAs terminated surveillance on RAMOS, but continued watching LOPEZ in anticipation of another co-conspirator arriving. At approximately 8:45 PM, LOPEZ emerged from his hiding place and began walking around. LOPEZ approached some pedestrians and started speaking with them.

23. After speaking to a pedestrian at the intersection of 7th and Commercial, LOPEZ climbed a residential fence and hid in another property. At this point, ASU BPAs elected to approach LOPEZ to investigate the situation. BPA Clinton approached LOPEZ

and verbally identified himself as a U.S. Border Patrol Agent, while showing his service issued badge. BPA Clinton questioned LOPEZ regarding his citizenship. LOPEZ admitted to being a citizen of Mexico being illegally present in the United States. LOPEZ also admitted he made an illegal entry by climbing the border fence or by walking through an area other than through a designated Port of Entry (POE). LOPEZ was placed under arrest and transported to the El Centro Border Patrol Centralized Processing Center (CPC) for further processing and investigation. ASU BPAs then established a perimeter at RAMOS' residence in an attempt to arrest him for his involvement in alien smuggling.

24.    Material Witness LOPEZ stated he was born in Mexico and is a citizen of Mexico.  LOPEZ stated that he does not have any legal documents allowing him to live, work or remain in the United States legally.  LOPEZ stated he made arrangements with an unknown smuggler to be illegally smuggled into the United States. LOPEZ stated that he agreed to pay $14,000 USD to be illegally smuggled. LOPEZ stated his destination was Santa Maria, California to be with his family. LOPEZ stated he climbed over the border fence and swam across the canal until he reached a road. A White Nissan Sentra (Nissan) stopped near his location, and he boarded the rear passenger area of the vehicle. LOPEZ stated the Nissan drove him to a skate park and another smuggler met with him.  LOPEZ stated the smuggler took away his two cell phones and told him to wait near some metal trashcans.  LOPEZ stated he waited for a few hours, but no one came back for him. LOPEZ stated he got tired of waiting and walked away to ask for help.

25.    On February 18, 2025, at approximately 10:40 PM, RAMOS exited the **Target Location** and was apprehended by ASU Agents. At the time, RAMOS did not have the two cellular phones that he took away from LOPEZ on his person.  Given the evidence that he took phones from LOPEZ and was observed headed towards his residence thereafter, I have reason to believe he is storing them at the **Target Location**.

26.    Additionally, based upon my experience and training, consultation with other law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names,

electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the digital devices used for human smuggling located at the **Target Location**.  In light of the above facts and my experience and training, there is probable cause to believe that Edward Antonio RAMOS-Garcia used digital devices to communicate with others for human smuggling.  Further, in my training and experience, human smugglers may be involved in the planning and coordination of a human smuggling event in the days and weeks prior to an event. Based on my training and experience, it is also not unusual for human smugglers to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search for evidence including any digital devices seized at the **Target Location** for data, beginning on January 18, 2025 up to and including the date of execution of this warrant.

27.    Accordingly, I request a warrant to search the **Target Location**, as set forth in Attachment A, and seize items as set forth in Attachment B.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO ANY COMPUTERS OR OTHER ELECTRONIC STORAGE DEVICES

28.    With the approval of the Court in signing this warrant, agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

a.    After securing the premises, or if sufficient information is available pre-search to make the decision, the executing agents will determine the feasibility of obtaining forensic images of electronic storage devices while onsite. A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this

warrant. The feasibility decision will be based upon the number of devices, the nature of the devices, the volume of data to be imaged, the need for and availability of computer forensics specialists, the availability of the imaging tools required to suit the number and nature of devices found, and the security of the search team. The preference is to image onsite if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the agents' safety. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive - the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

b.      If it is not feasible to image the data on-site, computers and other electronic storage devices, including any necessary peripheral devices, will be transported offsite for imaging. After verified images have been obtained, the owner of the devices will be notified, and the original devices returned within forty-five (45) days of seizure absent further application to this court.

<u>Identification and Extraction of Relevant Data</u>

c.      After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users. Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

d.    Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.  Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

e.    It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is

not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

        f.    Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling. For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data. And this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

        g.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The

identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

h.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

Genuine Risks of Destruction

i.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## PROCEDURES FOR ELECTRONICALLY STORED INFOFRMATION AS TO CELLULAR TELEPHONES

29.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be minicomputers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

30.    Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

31.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual

1  review, and, consequently, may take weeks or months. The personnel conducting the

2  identification and extraction of data will complete the analysis within ninety (90) days,

3  absent further application to this court.

4  Prior Attempts to Obtain Data

5       32.    The United States has not attempted to obtain this data by other means.

6

7  / / /

8

9  / / /

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

34.    Based on the foregoing, I submit that there is probable cause to enter and search the **Target Location** as described in Attachment A to seize the items as set forth in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

LUCAS J. HEIPT
BORDER PATROL AGENT

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 19th day of February, 2025.

9:02 p.m.

HONORABLE LUPE RODRIGUEZ, JR.
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PROPERTY TO BE SEARCHED

### *611 West Commercial Avenue, El Centro, California 92243*

The SUBJECT PREMISES to be searched is 611 West Commercial Avenue, El Centro, California, 92243, and includes the residence, all rooms, attics, basements, garages, storage areas, safes, briefcases, containers, trash areas, trash containers, surrounding grounds, vehicles associated with this address and outer buildings of any kind located thereon. The SUBJECT PREMISES is located within the city boundaries of El Centro, California, and is described as follows:

The residence is a detached one-story white with a brown roof residence with stucco on the exterior. The perimeter of the residence is enclosed with a four-foot-tall chain link fence and a chain link fence that opens for access to the car port. The residence is accessible from Commercial Avenue as well as from the alley between Commercial Avenue and Broadway Avenue. The west end of the alley is accessible from 7th Street and the east end of the alley is accessible from 6th Street. The metal security front door is hinged on the left with the door handle on the right side.

On the following page are photographs of the front and the overhead view of the SUBJECT PREMISES.


Front view of 611 West Commercial Avenue.


Rear view from the alley of 611 West Commercial Avenue.

# ATTACHMENT B

## ITEMS TO BE SEIZED

The items to be seized are evidence of transportation of certain aliens, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii), and conspiracy to commit the same, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) and (v)(I):

a.    Lists containing names of associates and arrangers involved in alien smuggling, bringing illegal aliens into the United States, harboring illegal aliens, and transporting illegal aliens within the United States.

b.    Lists, ledgers, logs, records, and other documents concerning the number of aliens smuggled into the United States from a place outside thereof, the number of aliens harbored, the number of aliens transported within the United States, and the amount of money paid and received for such smuggling activities.

c.    Financial records, bank records, check books, money orders, money order receipts, U.S. currency, and foreign currency that may be proceeds of alien smuggling activities.

d.    Documents showing possession, dominion, and/or control of the Subject Premises, including but not limited to utility bills and statements, telephone records, correspondence, mail, rental or lease agreements, real estate deeds, and other documents related to the Subject Premises.

e.    Property of smuggled aliens in the form of wallets, purses, suitcases, tote bags, clothing, identification documents, and entry documents, which constitute evidence of harboring and smuggling illegal aliens.

f.    Travel documents and correspondence, both domestic and foreign, relating to alien smuggling arrangements and itineraries.

g.    Vehicle registration documents of vehicles used in the smuggling and transportation of illegal aliens.

h.   Passports and any United States Government documentation relating to the alienage of persons.

i.   Foreign passports and foreign identification documents relating to the alienage of persons.

j.   Airline/airfare tickets relating to the travel of illegal aliens, to include other modes of transportation.

k.   Cellular telephones and cellular telephone records that may be used by alien smugglers to facilitate alien smuggling operations, including but not limited to stored information, text messages and voice messages relating to arrangements of travel and payment, names and telephone numbers of co-conspirators and illegal aliens.

l.   Two-way radios and two-way radio records that may be used by alien smugglers to communicate in areas with sparse cellular telephone coverage, AND

m.   Weapons, firearms and ammunition.

As used throughout this list of items to be seized, the terms "items," "documents" and "records" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including floppy diskettes, hard disks, ZIP disks, CD-ROMs, optical backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

2.   Authorization is sought to search for and seize evidence of the crimes described above in paragraph 1. This authorization includes the search of physical documents and includes the search of cell phones.

The seizure and search of any cell phones will be conducted in accordance with the "Procedures for Electronically Stored Information" provided in the affidavit submitted in support of this warrant. The evidence to be seized from the cell phones will be electronic records, communications, and data such as emails, text messages,

photographs, audio files, videos, and location data, including but not limited to the following:

    a.    All documents, including all temporary and permanent electronic files and records, relating to any and all of the items described in paragraph 1 above.

    b.    User-attribution data to include data reflecting who used or controlled the cell phone at or around the time that data reflecting criminal activity within the scope of this warrant was created, accessed, deleted, modified, copied, downloaded, uploaded or printed. User-attribution data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the device, electronic address books, calendars, instant messaging logs, electronically stored photographs and video, file structure and user-created documents, including metadata.

    3.    Authorization to search the cellular telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones for evidence described below. The seizure and search of the cellular telephones shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of January 18, 2025, up to and including the date of the execution of this warrant:

    a.    tending to indicate efforts to transport smuggled aliens from Mexico into the United States and within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the transportation of smuggled aliens;

    c.    tending to identify co-conspirators, criminal associates, or others involved in the transportation of smuggled aliens;

     d.     tending to identify travel to or presence at locations involved in the transportation of certain aliens such as stash houses, load houses, or delivery points;

     e.     tending to identify the user of, or persons with control over or access to, the Target Devices; and/or

     f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(ii) and (v)(I).